**Affirmed and Memorandum Opinion filed August 10, 2021.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-19-00432-CR**

---

**OSCAR MEJIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 208th District Court
Harris County, Texas
Trial Court Cause No. 1466767**

---

## MEMORANDUM OPINION

Appellant Oscar Armando Mejia appeals his conviction of continuous sexual abuse of a child. In five issues he contends that his trial counsel was ineffective. In two issues he contends that the trial court abused its discretion in admitting evidence of an extraneous offense and in limiting cross-examination of certain witnesses. We affirm.

# I. BACKGROUND

Appellant was convicted of continuous sexual abuse of a child. The complainant child was between the age of nine and eleven when appellant committed three separate instances of sexual abuse. Each incident occurred at appellant's home while the complainant was spending the night. The complainant's father, who is also appellant's uncle, asked the complainant about whether appellant had touched the complainant inappropriately after reviewing a series of text messages between appellant and another young family member, "J.T." The complainant told his father that appellant had touched his "private part" under his pants while they were watching a movie at appellant's home. Later, when the complainant's mother asked the complainant about appellant, the complainant said that appellant had put his penis inside the complainant's anus.

The complainant testified that he and his brother went to appellant's apartment several times a year. While at appellant's apartment, the complainant, his brother, and appellant would lie on the floor and watch movies. During the movie, appellant would touch the complainant's penis and penetrate the complainant's anus. The first instance of sexual assault occurred during Christmas vacation and the last was on the complainant's eleventh birthday. Also on the complainant's eleventh birthday, in addition to penetrating complainant's anus, appellant also put his mouth on the complainant's penis.

O.T., another family member, testified that when he was twelve, he spent the night at appellant's apartment and awoke to find appellant touching O.T.'s penis. J.T. testified that he admitted to telling appellant's attorney that the complainant lied about appellant sexually assaulting him and that he felt sorry about what was happening to appellant. J.T. then told the jury that the complainant never asked him to lie and that he believed appellant assaulted the complainant. J.T. also

2

admitted that he initially told his mother that the text message he received from appellant was sexual in nature, but then later told her it was not sexual. At trial J.T. testified that the text message was sexual. J.T. testified that he felt sorry for appellant and what was happening to him. J.T. testified that he did not fully witness the sexual assault that occurred on the complainant's birthday, but he did see appellant "hugging" the complainant under the covers and the complainant looking uncomfortable and moving a lot while appellant hugged him and held him in place.

Appellant testified that he was very close to the complainant and loved him like a son. He testified that he told the police that he may have accidentally touched the complainant's penis while they were asleep following the complainant's birthday. Appellant testified that the only time the complainant spent the night at appellant's apartment was on the complainant's eleventh birthday. Appellant admitted during cross-examination that he told an investigator in an earlier statement that the complainant had stayed at appellant's home overnight a few other times, but appellant clarified that he meant the complainant had just visited and not stayed the night.

Appellant's wife testified that the complainant only spent the night once at their apartment. Appellant's mother testified that her brother, the complainant's father, was a liar. She also testified that the complainant and the other "boys" had spent the night at appellant's apartment on many occasions but admitted she did not witness them at the apartment.

The jury returned a verdict of guilt. Appellant filed a motion for new trial but did not raise the ineffective assistance issues in the motion. The motion for new trial was overruled by operation of law. This appeal followed.

3

# I. INEFFECTIVE ASSISTANCE

In his first five issues, appellant contends that his trial counsel was ineffective for (1) calling appellant's mother as a witness because her testimony contradicted appellant's main defensive theory; (2) allowing the "child abuse pediatrician" to testify that she "believed" the complainant; (3) introducing text messages into evidence that appellant wanted a sexual favor from another child; (4) calling a witness who opined that appellant sexually abused the complainant; and (5) calling a witness who testified that appellant had sexually abused him.

## A. Legal Principles

To prevail on a claim of ineffective assistance, an appellant must show that (1) counsel's performance was deficient by falling below an objective standard of reasonableness and (2) counsel's deficiency caused the appellant prejudice—there is a probability sufficient to undermine confidence in the outcome that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Perez v. State*, 310 S.W.3d 890, 892–93 (Tex. Crim. App. 2010). An appellant must satisfy both prongs by a preponderance of the evidence. *Perez*, 310 S.W.3d at 893.

Generally, a claim of ineffective assistance may not be addressed on direct appeal because the record usually is not sufficient to conclude that counsel's performance was deficient under the first *Strickland* prong. *See Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005); *see also Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) ("A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim."). Ordinarily, trial counsel should be afforded an opportunity to explain counsel's actions "before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). A defendant is not entitled to "errorless or

perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

"Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation." *Salinas*, 163 S.W.3d at 740. "To overcome the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quotation omitted).

It is the "rare case" when an appellant raises a claim of ineffective assistance on direct appeal and the record is sufficient to make a decision on the merits. *Andrews*, 159 S.W.3d at 103. We must presume that trial counsel's performance was adequate unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *State v. Morales*, 253 S.W.3d 686, 696-97 (Tex. Crim. App. 2008) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). "The record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify counsel's acts or omissions, regardless of [counsel's] subjective reasoning." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). If there is a potential reasonable trial strategy that counsel could have been pursuing, we cannot conclude that counsel performed deficiently. *See Andrews*, 159 S.W.3d at 103.

## B.     Was Trial Counsel Ineffective for Calling Mother to Testify?

Appellant argues trial counsel was ineffective because he called appellant's mother to testify and her testimony contradicted appellant's "main defense" at trial. Appellant argues that the jury was evenly deadlocked prior to asking the trial court to read back the mother's testimony about whether the complainant had stayed the

night at appellant's home more than once and the jury only returned a unanimous guilty verdict once this testimony was provided. Because of this, appellant argues, trial counsel "decimated" appellant's main defensive theory causing the jury to "not believe appellant, appellant's wife, and appellant's father-in-law" that the complainant had only spent the night at appellant's home once.

Trial counsel called appellant's mother to testify in appellant's defense. Trial counsel asked appellant's mother whether the complainant's father, her brother, was a liar or truth-teller. In trial counsel's opening statement he stated that "[appellant's] mother . . . will testify also as to one of the statements made by [her brother]. She will be serving as an impeachment witness to her brother's statement. . . . But she will also talk as to the character of [appellant] as well." During argument to the trial court, trial counsel argued that appellant's mother would be called to impeach the complainant's father's testimony:

> The question was: Has he ever made any statements in front of other family members saying that it doesn't matter to him whether Mr. Mejia is innocent. What matters to him is his reputation. And he said, I have never said that. And so his sister is here to testify as to that statement. She was a witness to that statement.

Appellant's mother testified that her brother was a liar. On cross-examination by the State, appellant's mother admitted that she was aware that the complainant, his brother, O.T, and J.T. spent the night more than once at appellant's apartment. She also testified that at family gatherings, the boys would approach appellant and ask to go to his home and that they liked going to appellant's home. She never witnessed any of the boys say that they feared appellant or did not want to be around him.

Appellant cites to one case in support of his theory that trial counsel was ineffective for calling his mother to testify. In *Ex Parte Guzmon*, the Court of

Criminal Appeals concluded that the defendant's trial counsel was deficient because he did not sufficiently prepare at least two witnesses that he called during the punishment phase of trial noting that "counsel seemed not to know how the [witness], his own witness, would testify." 730 S.W.2d 724, 734 (Tex. Crim. App. 1987). "Witness preparation is vital to an effective defense presentation." *Id*. However, the court in *Guzmon* had the benefit of trial counsel's explanation of strategy and preparation from the writ hearing. *Id*. at 725.

Here, there is no explanation from trial counsel of his strategy or preparation. Appellant did not move for a new trial on ineffective assistance grounds and did not afford his trial counsel an opportunity to explain strategy or preparation. Without more, we cannot evaluate whether trial counsel had a reasonable trial strategy for calling appellant's mother, whether he had prepared by talking with her prior to trial and what was discussed, and whether he knew what her testimony would be regarding whether the boys had spent multiple nights over at appellant's home. *See Darkins v. State*, 430 S.W.3d 559, 571 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd) ("The record does not reflect counsel's strategy for [the defendant's] testimony, nor does it reflect [the defendant's] preparation for trial. Without a fully developed record, we cannot speculate on appellant's counsel's strategy.").

We overrule appellant's first issue.

## C.     Was Trial Counsel Ineffective for Eliciting Opinion Testimony?

In his second issue appellant argues that trial counsel was ineffective because he allowed the child abuse pediatrician to testify as to her "belief" that the complainant was telling the truth about the abuse. Trial counsel questioned the child abuse pediatrician who examined the complainant about how she does her

exams and why she asks certain questions. As part of this line of questioning, the following exchanges took place:

[Trial counsel] Q. Okay. Then you asked him, How did it feel when he did these things to you? And he said, Weird and sad, correct?

A. Yes.

Q. Why is it important to ask a child how these things feel? Isn't it just important that it happened regardless of how it makes him feel? Why is this question medically important?

A. . . . . It's important to understand the thoughts that are happening to the child because very often, when it's a family member, they have a lot of what we call internal attribution they bring on themselves. . . . So I try very hard to keep all the doors open to assess their risk.

Q. He said sad, and you believed him?

A. Yes.

Q. However, in the rest of your report you did not note that he cried or that he was sad or anxious; yet when he told you he was sad, you wrote down here and you believed him?

A. He had a painful event with a penis on his butt. Of course I believe him.

. . . .

Q. It's impossible to know that what this child was telling you was absolutely true or correct. There's no way of being a hundred percent certain, correct?

A. Well, there are indicators; but a hundred percent is a high bar. I don't know how to be a hundred percent certain about the trust of the content of most conversations.

Q. . . . there's never a really scientific way of verifying that children that have accused somebody of abuse, to an examiner like you, have told the truth and not exaggerated? There's no way to verify that?

A. There are practice standards about contextual detail and the use of the five senses and reliability. Those are how - - those dictate how we collect our information on the history to try and identify those children who may be, say, coached.

8

At the end of trial counsel's examination, the State requested a conference at the bench to address whether the State could elicit testimony about whether the child abuse pediatrician believed that the complainant was telling the truth or not. The State argued that defense counsel had "opened the door" to such testimony through his line of questioning. Appellant's trial counsel responded that:

> . . . that wasn't the question. I think they are trying to confuse two issues, Your Honor. The question is about certainty of their understanding of what's the truth as the child is being told. The question is more directed - - the question is more a physical doctor, how does she - - how does she decide what information she's jotting down. That's what I am trying to get to.

Appellant argues on appeal that trial counsel was ineffective because he allowed the child abuse pediatrician to testify that "she believed the complainant's claim that appellant sexually abused him." However, the context of the line of questioning shows that her testimony was not about whether she believed that the complainant was sexually assaulted by appellant, but that she believed the complainant was "sad." The question trial counsel asked was "yet, when he told you he was sad, you wrote down here and you believed him?" The question was not eliciting a response, and the child abuse pediatrician did not testify, that she believed the complainant when he said he was sexually assaulted. Just a few questions later, trial counsel elicited testimony from the witness that she could not ever be certain a child was telling her the truth and that sometimes children were coached by an adult.

Similarly in appellant's fourth issue, he argues that trial counsel was ineffective because he called J.T. as a witness and elicited testimony that J.T. believed appellant sexually abused the complainant. On direct examination, appellant's trial counsel confronted J.T. with the numerous inconsistencies in his story about what happened between himself, the complainant, and appellant. Trial

9

counsel confronted J.T. with a recorded telephone conversation between trial counsel and J.T. wherein J.T. admitted that the complainant told him to lie and say that appellant had touched the complainant. J.T. then testified that "I lied on the phone, yes. [The complainant] did not tell me to lie. I said that by myself. I just didn't want nothing to do with . . . this situation anymore because I deeply know that something did happen with [appellant] and [the complainant]." Trial counsel further confronted J.T. with additional text messages that he sent to appellant wherein J.T. said he was sorry to appellant, that he still cared about appellant and appellant's family, and that he would lie to his parents to come and see appellant. In the same messages, appellant responded that J.T. was always welcome, but that he could not come stay at appellant's home because of the case. On re-cross examination, the State asked whether J.T. was "confused about what . . . to do in this situation?" J.T, responded that he had forgiven appellant but "that doesn't mean that I believe he didn't do nothing to [the complainant] . . . . I don't think he is innocent, that's what I am trying to say." Trial counsel did not object to this response.

Appellant cites to three cases in support of his argument that trial counsel was ineffective for eliciting opinion testimony and failing to object to opinion testimony. In *Garcia*, the appellate court found the defendant's trial counsel ineffective because he did not object when the State asked two witnesses about "the truthfulness of the testimony of the complaining witnesses." 712 S.W.2d 249, 253 (Tex. App.—El Paso 1986, pet. ref'd). In *Miller v. State*, two experts and the complainant's mother testified that "each believed the complainant was telling the truth." 757 S.W.2d 880, 883 (Tex. App.—Dallas 1988, pet. ref'd) (the State asked, "[D]o you have an opinion as to whether or not [the complainant] has . . . been sexually abused?"; the witness responded "Yes . . . . This child has been sexually

abused."). The court determined that trial counsel was ineffective for failing to object to the inadmissible testimony. *Id*. at 884. In *Fuller v. State*, the State elicited the expert's opinion testimony about the expert's "particular determination of [the complainant's] truthfulness." 224 S.W.3d 823, 835 (Tex. App.—Texarkana 2007, no pet.) (the State asked, "[D]id you form an opinion as to whether she was being truthful with you?"; the witness responded, "I saw nothing in her demeanor and nothing in the information that she gave me that indicated that she was not being truthful with me."). The court determined trial counsel was ineffective for failing to object the inadmissible testimony. *Id*. at 836.

This case is distinguishable from *Garcia*, *Miller*, and *Fuller* where the witnesses were asked whether they believed the complainant was truthful. Here, trial counsel was asking a specific question about whether the child abuse pediatrician believed the complainant when he responded he was "sad" and delved into her process of interviewing. It appears trial counsel was trying to show that while the complainant said he was "sad" there did not appear to be any further indications that he was feeling sad or distressed. Trial counsel never asked whether the child abuse pediatrician had an opinion as to whether the complainant was telling the truth about the sexual assaults. From the record, it appears that trial counsel was questioning the child abuse pediatrician about her process of interviewing, taking notes, and whether some children are coached to fabricate stories of sexual assault.

Regarding J.T.'s testimony, trial counsel was not asking for J.T.'s opinion about whether he believed something happened or whether the complainant was telling the truth. From the record it appears that trial counsel was trying to highlight how inconsistent J.T.'s statement were, that J.T. admitted to lying over

11

the course of the proceedings, and that J.T.'s unreliable statements were the ones that started the entire inquiry into appellant's conduct.

Even considering the context of the testimony, the record is silent as to trial counsel's strategy for eliciting this testimony from the child abuse pediatrician and failing to object to J.T.'s testimony. As a result, appellant has failed to meet his burden to show that trial counsel's performance was deficient. *See Lopez v. State*, 343 S.W.3d 137, 143–44 (Tex. Crim. App. 2011) ("The record is silent as to why trial counsel failed to object to the outcry-witness testimony. . . . appellant did not produce additional information about trial counsel's reasons for allowing all three outcry witnesses to give similar testimony about the same event or for allowing opinion testimony about the credibility of the complainant, both without objection."); *Macias v. State*, 539 S.W.3d 410, 417 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) ("[T]he record in this case is silent concerning trial counsel's reasons for failing to object to Gomez's testimony regarding D.M.'s credibility. In the absence of evidence concerning trial counsel's reasons for failing to object to this opinion testimony, we conclude that appellant has failed to meet his burden . . . .").

We overrule appellant's second and fourth issues.

## D.     Was Trial Counsel Ineffective for Introducing the Text Messages?

In his third issue appellant argues that trial counsel was ineffective when he introduced text messages between J.T. and appellant that suggested "appellant wanted 'something' sexual" from J.T. Appellant argues that trial counsel "introduced highly prejudicial evidence (the text messages) for no valid purpose."

During the State's case-in-chief, the complainant's father testified that the case against appellant "started with some text messages" sent between J.T. and

12

appellant.  The State never sought to put these text messages into evidence.  On cross-examination, the complainant's father testified about the text messages but confirmed that they were in English and that he only understood "a little" English and testified he "didn't understand all because my English, it's not too much; so I couldn't understand everything."  At this point, trial counsel introduced the text messages into evidence.  Trial counsel asked the complainant's father about what part of the messages aroused his suspicions, why he waited so long to tell his wife or ask the complainant, and why he did not ask appellant or J.T.  When questioning J.T. on direct examination, trial counsel confronted J.T. with the text messages and their meaning.  J.T. testified that he believed that the messages were of a sexual nature.  Trial counsel then impeached J.T. with his prior statement that he had admitted to lying about the text messages being sexual.  Finally, in closing argument, trial counsel argued that:

> We . . . have brought evidence that . . . the State didn't bring to you. We wanted you to see everything, whether it was good -- even when it wasn't that great, we put it in front of you. So we think that's fair. Stuff the State didn't want you to hear. Witnesses like [J.T.] they didn't want you to hear from. We put them in front of you so you can be a fair judge. That's what the Judge expects from you, and that's what I expect from you.

Appellant argues that trial counsel "introduced into evidence the extremely damaging and prejudicial text messages between [J.T.] and appellant" and that "these text messages had no purpose in appellant's defense."  Appellant argues that this evidence could not have been introduced by the State and that trial counsel did the State a favor by introducing them into evidence. Appellant argues the text messages are clearly inadmissible without citing or outlining any argument as to why the text messages were clearly inadmissible.

13

Where evidence is clearly inadmissible "there can be no reasonable trial strategy for introducing it before the jury." *Huerta v. State*, 359 S.W.3d 887, 892 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Robertson v. State*, 187 S.W.3d 475, 485–86 (Tex. Crim. App. 2006)); *see Ex Parte Skelton*, 434 S.W.3d 709, 722 (Tex. App.—San Antonio 2014, pet. ref'd) ("Where a defendant's credibility is central to her defensive strategy, it is not sound trial strategy to allow the introduction of inadmissible evidence that directly impairs the defendant's credibility without objection."). However, it may be strategic to pass over the admission of prejudicial and arguably inadmissible evidence. *Ex Parte Menchaca*, 854 S.W.2d 128, 132 (Tex. Crim. App. 1993) (quoting *Lyons v. McCotter*, 770 F.2d 529, 534 (5th Cir. 1985)). In addition to there being no record of trial counsel's explanation of his strategy or preparation, appellant does not argue or show how this evidence was clearly inadmissible in this case. As a result, appellant has failed to meet his burden under *Strickland*. *See Lopez*, 343 S.W.3d at 144.

We overrule appellant's third issue.

**E.     Was Trial Counsel Ineffective for Calling J.T. to Testify?**

In his fifth issue, appellant argues that his trial counsel was ineffective when he called J.T. to testify because he testified that appellant sexually abused him.

After direct examination by trial counsel, the State cross-examined J.T. about the text messages. J.T. testified that his mother kept on asking J.T. what was meant by the text messages and that he "had to tell her" that appellant "tried" to "get with" him. Trial counsel asked to approach the bench and conduct a hearing on "extraneous witness testimony" concerning any allegations that appellant ever had any sexual encounters with J.T. The State argued that trial counsel opened the door to this line of questioning by introducing the text messages and the trial court

14

agreed. Trial counsel objected to the testimony under Rules of Evidence 401, 402, 403, and 404 and the trial court overruled his objections. J.T. then testified that he thought appellant was trying to "get with" him:

> [State]: So you said earlier that you finally had to tell her the truth because she kept asking about the text messages. So what was your truth? What did you tell her?
>
> [J.T.]: That I know for sure that [appellant] was trying to get with me because also [the complainant] came -- he confronted me, and he told me that [appellant] did touch him or that he did try to touch him. Also, [O.T.] told me. So I just connected the dots and I just -- you know, my mom found the messages by accident. It's not like I came up to her and I told her and -- she found it and she just came up to me and I should have told her before. I just -- I was just little and scared. I thought he was a good guy, you know.
>
> . . . .
>
> Q So [the complainant] told you about what [appellant] had been doing to him?
>
> A That one night, yeah.
>
> Q And [O.T.] also told you about what [appellant] had been doing?
>
> A Yes, the same date.
>
> Q And you also confirmed to them that he had –
>
> A About the messages.
>
> Q – [Appellant] had been doing the same things to you?
>
> A Yes.
>
> Q And you were uncomfortable when your mom found these text messages?
>
> A Yeah.

Earlier on direct examination by trial counsel, J.T. testified that O.T. told him that appellant tried to touch him, not that he ever actually touched him. J.T. never testified about any details about any alleged sexual encounter with appellant and

15

repeatedly stated that he thought appellant was trying to "get with" him but not that any sexual contact had happened.

As detailed above, from the record it appears that trial counsel called J.T. as a witness to show that he had admitted to lying about the meaning of the text messages, that he had apologized to appellant for what J.T. had done to him, that his statements were inconsistent, and that he was not actually afraid or wary of appellant in any way. J.T. also testified that O.T. had disclosed to him that appellant had not touched him but only tried to touch him, highlighting another inconsistency in the stories told by the children against appellant.

"[T]he decision whether to present witnesses is largely a matter of trial strategy." *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd). "We cannot on appeal hold that a trial strategy which did not develop as planned, constitutes such ineffective assistance of counsel that would require a reversal." *Hicks v. State*, 630 S.W.2d 766, 768 (Tex. App.—Houston [1st Dist.] 1982, pet. ref'd) (counsel not ineffective for calling parole officer to testify about important fact issue in defense of case where "residual effect" was that parole officer also testified about extraneous offenses). "We are not in a position to 'second guess', through appellate hindsight, the strategy adopted by counsel at trial." *Id*. Without the benefit of knowing trial counsel's rationale in calling J.T. as a witness, we cannot second guess trial counsel's strategy through hindsight.

We overrule appellant's fifth issue.

## II.    EXTRANEOUS OFFENSE EVIDENCE

In his sixth issue, appellant asserts that the trial court abused its discretion by permitting evidence of an extraneous offense under article 38.37 of the Texas Code of Criminal Procedure by utilizing the wrong standard of admissibility. Appellant

16

argues that the trial court should not have admitted the extraneous offense testimony because article 38.37 "does not dispense with the need for corroboration regarding testimony of an extraneous offense." Appellant's argument is that "beyond reasonable doubt" under article 38.37 requires corroborating evidence despite article 38.07 of the Code of Criminal Procedure.

## A.  General Legal Principles

"The admissibility of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). "If there is evidence supporting the trial court's decision to admit evidence, there is no abuse and the appellate court must defer to that decision." *Id*. at 538. "Even when the trial judge gives the wrong reason for his decision . . . if the decision is correct on any theory of law applicable to the case it will be sustained." *Id*. (citation omitted).

Article 38.37 of the Code of Criminal Procedure allows the introduction of evidence that the defendant has committed another sexual offense against another child "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. art. 38.37, §§ 1–2.

> Before evidence described by Section 2 may be introduced, the trial judge must: (1) determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt; and (2) conduct a hearing out of the presence of the jury for that purpose.

Tex. Code Crim. Proc. art. 38.37, § 2-a.

Article 38.37 states that the trial court must determine that the evidence likely to be admitted will be adequate to support a finding by the jury that the

17

defendant committed the extraneous offense beyond a reasonable doubt. *See* Tex. Code Crim. Proc. art. 38.37, § 2-a. It is well established that the uncorroborated testimony of a child victim alone can be sufficient to support a conviction of indecency with a child by contact. Tex. Code Crim. Proc. art. 38.07; *see also Chasco v. State*, 568 S.W.3d 254, 258 (Tex. App.—Amarillo 2019, pet. ref'd). These types of cases are often "he said, she said" in which the jury must reach a unanimous verdict based on two completely different versions of an event without any corroborative evidence. *See Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009).

## B.    Background

Outside of the presence of the jury, another of appellant's male cousins, O.T., testified that one night when he slept over at appellant's home, appellant touched his penis on the outside of his pants. O.T. testified that he was fourteen or younger when this incident occurred. O.T. testified that he did not tell anyone about the incident because he would "make excuses why it didn't happen" and that he was scared and embarrassed.

## C.    Analysis

Appellant argues that a higher burden should be placed on the admission of extraneous offense evidence than that is required to prosecute such an act. Article 38.37 uses the term "beyond a reasonable doubt" which is the same standard that would have to be met in the prosecution of such an offense. Thus, where in the prosecution of indecency with a child by contact, the uncorroborated testimony of a child victim would be legally sufficient to support a conviction, the same uncorroborated testimony would be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt under article 37.38, § 2-a. Given that the statute has other procedural safeguards in place,

we decline to hold that article 38.07 does not apply to extraneous act evidence sought to be admitted through article 38.37 §2-a. *See Perez v. State*, 562 S.W.3d 676, 689 (Tex. App.—Fort Worth 2018, pet. ref'd) ("Physical evidence and a timely report to the authorities are not required to support a conviction for sexual assault or indecency with a child. Here, their testimony alone was sufficient . . . . We overrule [the defendant's] second point in regard to the admissibility of [the] testimony under article 37.38."). As a result, the admission of the evidence regarding the extraneous act without requiring corroborating evidence was not an abuse of discretion.

We overrule appellant's sixth issue.

### III.   LIMITING CROSS-EXAMINATION

In appellant's seventh issue he argues that the trial court abused its discretion by limiting appellant's cross-examination of the complainant, J.T, and O.T. "regarding their sexual preference for males" because it was "relevant to show possible bias, interest, or motive for testifying against appellant." Appellant argues that sexual orientation was relevant because "[t]he jury did not have any other option but to presume that [the complainant] could not have knowledge of such homosexual acts, unless appellant had committed those acts against him."

### A.   General Legal Principles

A trial court's decision to exclude evidence is reviewed under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). We must uphold the trial court's decision if it is in the zone of reasonable disagreement. *Id.* A trial court does not abuse its discretion if some evidence supports it decision. *Osbourn*, 92 S.W.3d at 538. We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *Id.*

19

"Exposing a witness' motivation to testify for or against the accused or the State is a proper and important purpose of cross-examination." *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998). "Parties are allowed great latitude to show 'any fact which would or might tend to establish ill feeling, bias, motive and animus on the part of the witness.'" *Id.* (quoting *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987)). This right is not unqualified; the trial judge has discretion to limit the scope and extent of cross-examination as appropriate. *In re O.O.A.*, 358 S.W.3d 352, 355 (Tex. App.—Houston [14th Dist.] no pet.) (citing *Smith v. State*, 352 S.W.3d 55, 64 (Tex. App.—Fort Worth 2011, no pet.)).

The proponent of evidence to show bias must show that the evidence is relevant "by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party." *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004) (en banc). The trial court does not abuse its discretion by excluding evidence of alleged bias or motive if the defendant's offer of proof does not establish the required nexus. *See id.* at 111–12.

## B.     Background

During the offer of proof, trial counsel stated that in questioning the complainant:

> We would have asked him what his sexual orientation was. And it is our expectation that he would have said that he is gay. . . . an important part of the Defense's theory as to knowledge regarding these children and the sexual descriptions that they have given throughout this trial.

Trial counsel later made another proffer stating:

> [I]f it would be allowed by the Court to address questions to the children that will testify during the case in chief concerning their

20

sexuality or sexual preferences from a young age, including [O.T.], if he were to testify, [J.T.], and the complainant. If the Court would allow it, we would ask that question of whether they have the sexual preference towards other males, if they are gay or not.

The trial court did not allow trial counsel to ask the children what their sexual orientation was.

## C.    Analysis

Appellant argues that because of the exclusion of this evidence that the jury was forced to believe that the only way the children, particularly the complainant, could have possessed knowledge of such acts was because appellant had committed them on the children.  However, the record does not establish any nexus between the proffered evidence, the sexual orientation of the children, and their knowledge regarding specific sexual acts.  Simply put, there is no indication in the record that the children's sexual orientation gave them knowledge of specific sexual acts.  *See Carpenter v. State*, 979 S.W.2d 633, 635 n.4 (Tex. Crim. App. 1998) (upholding exclusion of evidence related to witness's pending federal criminal charges because "[n]aked allegations which do no more than establish the fact that unrelated federal charges are pending do not, in and of themselves, show a potential for bias"); *see also In re O.O.A.*, 358 S.W.3d at 355 (upholding exclusion of evidence of complainant's alleged sexual orientation where the defendant failed to show nexus between orientation and motivation to testify against the defendant).

Appellant cites to *Vaughn v. State*, to support his argument that "sexual orientation might be relevant to show bias."  *See* 888 S.W.2d 62 (Tex. App.— Houston [1st Dist.] 1994), *aff'd*, 931 S.W.2d 564 (Tex. Crim. App. 1996).  In *Vaughn*, the witness was asked whether she was romantically involved with the female defendant.  888 S.W.2d at 74.  The prosecution then followed up with the question of whether it was a "fair characterization to say that when two people are

21

in love with each other, you care deeply for someone, that you will do whatever you can to protect them and help them?" *Id*. The subject of the prosecution's question was the relationship between the witness and the defendant, not the sexual orientation of the defendant or the witness. *Id*. at 75. Thus, *Vaughn* does not support appellant's contention that the evidence in this case should have been admitted.

As the proponent of evidence, appellant failed to demonstrate a nexus or logical connection existed between the witness's testimony and the witness's potential motive to testify against the accused. *See Woods*, 152 S.W.3d at 111. Because appellant failed to show this nexus, the trial court did not abuse its discretion in excluding the evidence.

We overrule appellant's seventh issue.

## IV. CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/     Ken Wise
        Justice

Panel consists of Justices Wise, Bourliot, and Spain.

Do Not Publish — TEX. R. APP. P. 47.2(b).